FILED
CLERK, U.S. DISTRICT COURT

MAY - 1 2008

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

1

2

3

4

5

6

7

8            UNITED STATES DISTRICT COURT

9            CENTRAL DISTRICT OF CALIFORNIA

10

11   MIGUEL PALENZUELA,            )   NO. CV 06-4600-FMC(E)
                                   )
12                  Petitioner,    )
                                   )
13        v.                       )   ORDER ADOPTING FINDINGS,
                                   )
14   D.L. OLLISON, Warden,         )   CONCLUSIONS AND RECOMMENDATIONS OF
                                   )
15                  Respondent.    )   UNITED STATES MAGISTRATE JUDGE
                                   )
16   _____)

17

18        Pursuant to 28 U.S.C. section 636, the Court has reviewed the

19   Petition, all of the records herein and the attached Report and

20   Recommendation of United States Magistrate Judge. The Court approves

21   and adopts the Magistrate Judge's Report and Recommendation.

22

23        IT IS ORDERED that Judgment be entered denying and dismissing the

24   Petition with prejudice.

25   ///

26   ///

27   ///

28   ///

1        IT IS FURTHER ORDERED that the Clerk serve copies of this Order,

2   the Magistrate Judge's Report and Recommendation and the Judgment

3   herein by United States mail on Petitioner and counsel for Respondent.

4

5        LET JUDGMENT BE ENTERED ACCORDINGLY.

6

7        DATED:   *April 30*                , 2008.

8

9                            *Florence Marie Cooper*

10                       FLORENCE-MARIE COOPER
                         UNITED STATES DISTRICT JUDGE

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1
2
3
4
5
6
7
8          UNITED STATES DISTRICT COURT

9          CENTRAL DISTRICT OF CALIFORNIA

10

11  MIGUEL PALENZUELA,            ) NO. CV 06-4600-FMC(E)
                                  )
12              Petitioner,       )
                                  )
13      v.                        ) REPORT AND RECOMMENDATION OF
                                  )
14  D.L. OLLISON, Warden,         ) UNITED STATES MAGISTRATE JUDGE
                                  )
15              Respondent.       )
                                  )
16  _____ )

17

18      This Report and Recommendation is submitted to the Honorable

19  Florence-Marie Cooper, United States District Judge, pursuant to 28

20  U.S.C. section 636 and General Order 05-07 of the United States

21  District Court for the Central District of California.

22

23                      PROCEEDINGS

24

25      Petitioner filed a "Petition for Writ of Habeas Corpus By a

26  Person in State Custody" on July 24, 2006.  Respondent filed an Answer

27  on November 16, 2006.  Petitioner filed a Traverse on January 16,

28  2007.

1       In Ground Seven of the Petition, Petitioner contends the

2  sentencing court imposed an upper term sentence in violation of

3  Apprendi v. New Jersey, 530 U.S. 466 (2000) ("Apprendi"), and Blakely

4  v. Washington, 542 U.S. 406 (2004) ("Blakely").  On January 22, 2007,

5  after the California Supreme Court denied Petitioner's habeas petition

6  containing his Apprendi/Blakely claim, the United States Supreme Court

7  issued its decision in Cunningham v. California, 127 S. Ct. 856 (2007)

8  ("Cunningham").  The Cunningham decision holds that a California

9  judge's imposition of an upper term sentence based on facts found by

10 the judge (other than the fact of a prior conviction) violates the

11 constitutional principles set forth in Apprendi and Blakely.

12

13      On March 27, 2007, this Court issued an "Order to Show Cause,"

14 ordering Petitioner to show cause in writing why the Court should not

15 require further exhaustion of Petitioner's Apprendi/Blakely claim in

16 light of Cunningham.  On April 25, 2007, Petitioner filed a response

17 to the Order to Show Cause, inter alia asserting that, in the event

18 that the Court were to require further exhaustion of Petitioner's

19 Apprendi/Blakely claim in light of Cunningham, the Court should stay

20 the Petition pending such exhaustion.

21

22      On June 18, 2007, the Court issued an "Order Staying Petition,"

23 staying the Petition to allow Petitioner to exhaust Ground Seven.

24 On January 7, 2008, Petitioner filed a "Notice and Motion to Resume

25 Habeas Proceedings after Stay and Exhaustion in the California Supreme

26 Court."  This document indicates that, on November 28, 2007, the

27 California Supreme Court denied Petitioner's habeas petition

28 containing his Apprendi/ Blakely claim.

1

**BACKGROUND**

2

3          The State charged Petitioner and his co-defendant, Pedro Pagan

4    Gonzales, with various crimes arising out of the defendants'

5    commission of several residential burglaries on January 10, 2001,

6    their unsuccessful attempt to flee capture during a high-speed police

7    pursuit, and the subsequent discovery of numerous stolen items in the

8    defendants' rented storage unit.  A jury found Petitioner guilty of

9    two counts of residential burglary in violation of California Penal

10   Code section 459, one count of evading a peace officer in violation of

11   California Vehicle Code section 2800.2(a), one count of being a felon

12   in possession of a firearm in violation of California Penal Code

13   section 12021(a)(1), four counts of receiving stolen property in

14   violation of California Penal Code section 496(a), and one count of

15   conspiracy to commit residential burglary in violation of California

16   Penal Code sections 182(a)(1) and 459 (Reporter's Transcript ["R.T."]

17   2755-60; Clerk's Transcript ["C.T."] 386-90).  Petitioner received a

18   sentence of twenty-seven years and eight months (R.T. 3035-38; C.T.

19   419-22, 427-28).

20

21          The Court of Appeal affirmed the judgment.  <u>See</u> <u>People v.</u>

22   <u>Gonzales</u>, 2003 WL 22346373 (Cal. Ct. App. Oct. 15, 2003).  The

23   California Supreme Court summarily denied Petitioner's petition for

24   review on January 14, 2004.  <u>See</u> <u>People v. Gonzales</u>, 2004 Cal. LEXIS

25   196 (Cal. Jan. 14, 2004).

26

27          On January 28, 2004, Petitioner filed a habeas corpus petition in

28   the California Supreme Court, which that court denied on November 17,

1 2004 with citations (Respondent's Lodgment 1).[1] On May 12, 2005,

2 Petitioner filed a habeas corpus petition in the Los Angeles County

3 Superior Court, which that court denied the same day (Respondent's

4 Lodgment 2). On June 1, 2005, Petitioner filed a habeas corpus

5 petition in the California Court of Appeal, which that court denied on

6 July 13, 2005 (Respondent's Lodgment 3). On August 26, 2005,

7 Petitioner filed a second habeas corpus petition in the California

8 Supreme Court, which that court denied on June 14, 2006 with citations

9 (Respondent's Lodgment 4). On June 11, 2007, Petitioner filed a third

10 habeas corpus petition in the California Supreme Court, which that

11 court denied summarily on November 28, 2007.[2]

12

13                          **FACTUAL BACKGROUND**

14

15      The following factual summary is taken from the opinion of the

16 California Court of Appeal in People v. Gonzales, 2003 WL 22346373

17 (Cal. Ct. App. Oct. 15, 2003). See Galvan v. Alaska Dep't of

18 Corrections, 397 F.3d 1198, 1199 & n. 1 (9th Cir. 2005) (taking

19 factual summary from state appellate decision).

20 ///

21 ///

22 ───────────────────

23      [1]    Respondent does not assert procedural default (see
   Answer, ¶ 7).

24      [2]    Although this third California Supreme Court petition
25 is not in the record, the Court takes judicial notice of the
   California Supreme Court's docket in In re Palenzuela, case
26 number S153811, available on the California courts' website at
   www.courtinfo.ca.gov. See Mir v. Little Company of Mary Hosp.,
27 844 F.2d 646, 649 (9th Cir. 1988) (court may take judicial notice
   of court records). That docket shows the filing date of
28 Petitioner's third California Supreme Court habeas petition.

                                4

FACTS

Burglaries Committed January 10, 2001

(Burglary and Conspiracy to Commit Burglary)

On January 10, 2001, Karen Mayfield left her home in Torrance at approximately 7:00 a.m.  Her windows were closed and doors locked.  She returned home at about 8:20 p.m. and noticed that the front door was unlocked and there were pry marks on a sliding glass door.  Her home had been ransacked. At the Palos Verdes Police department she identified 38 items that had been taken from her house.

Lila Burden lived on Pacific Coast Highway in Torrance. She left her home at approximately 9:45 a.m. on January 10. She returned in the late afternoon to find that her backdoor and a sliding glass door were open and that her home had been ransacked.  Missing from her home were numerous pieces of jewelry, a radio, camera and credit cards.  She later identified these items at the Palos Verdes Police Department.

Randy Matsumoto was Lila's neighbor.  At 11:30 a.m. on that same day, a Hispanic man came to his door, and asked if he was "Mr. Goldstein."  Matsumoto told him no, and the man said he was there to give an estimate to remodel the kitchen.  Matsumoto became suspicious and followed the man to a gold mid-sized American car and wrote down the license plate number, 4LXT309.  A smaller-framed older Hispanic man was already seated in the car.  The first man got in the

5

1   driver's seat and drove off.

2

3   At 11:45 a.m. Helen Spates arrived at her Palos Verdes

4   home to find two men standing near her front door. One was

5   tall and appeared to be in his 30's. The other was shorter

6   and appeared to be in his 40's or 50's. Spates described

7   the men as either Hispanic or Mideastern. She stopped her

8   car and asked them what they wanted. They walked toward her

9   and the taller man asked for "Eric Ball." He said they were

10  there to give an estimate on a counter top. After Spates

11  told them she didn't know an Eric Ball the men got into a

12  "brownish gold" four door Oldsmobile. Spates copied down

13  their license plate, 4LXT309. The younger man got in the

14  driver's seat and they drove northwest onto Via Rivera.

15

16  Nancy McCauley lived on Palos Verdes Drive West. At

17  approximately 12:00 p.m. she was in her home when she heard

18  a loud cracking sound. She saw the blinds flutter and

19  looked outside to find a tall dark-haired man facing her.

20  He had broken the screen door. McCauley yelled and the man

21  turned and ran up the driveway. McCauley ran to her front

22  window and saw an older man on the front porch. He turned

23  and ran towards a "tanish-brown" car. The younger man got

24  in the driver's seat and they drove in the direction of the

25  police station. McCauley called 911.

26  ///

27  ///

28  ///

6

Evading an Officer

The police received a radio call concerning an attempted burglary by two Hispanic males.  Their car was described as a brown sedan heading east, in front of the police station.  Within several minutes an officer saw the car, license plate number 4LXT309.  As he followed the car, it accelerated to speeds up to 100 mph.  During the chase a handgun, credit cards, personal papers and a checkbook were thrown out of the passenger side window.  The car eventually collided with a pickup truck.  The driver and passenger fled on foot and were apprehended shortly afterwards.

Felon in Possession of a Firearm

The police recovered a .32-caliber semiautomic handgun from the roadway that resembled the firearm thrown from the car window.  Each appellant stipulated that he had previously been convicted of a felony.

Receiving Stolen Property

The police found property in appellants' car belonging to Burden and Mayfield.  Each appellant had in his possession a key to a public storage facility.  As a result, the police executed a search warrant and found the storage unit had been rented under appellants' aliases.  The unit

7

1    contained hundreds of items, some of which had been stolen

2    during residential burglaries a month earlier.  On

3    December 11, 2000, property was stolen from the homes of

4    Alex Topete and Alice Gaines.  At the storage facility

5    police found 10 items belonging to Topete and 15 items

6    stolen from the home of Gaines.  On January 4, 2001, the

7    home of Phillip Zorn was burglarized and, the following day,

8    property of Bobby Rollins was taken from his home.  At the

9    storage facility, the police found four items belonging to

10    Zorn and six items belonging to Rollins.

11

12                   **PETITIONER'S CONTENTIONS**

13

14    Petitioner contends:

15

16    1.  The trial court allegedly erred by refusing to permit

17  Petitioner to participate in all of the peremptory challenges allotted

18  to Petitioner's co-defendant, and by denying Petitioner's request for

19  additional peremptory challenges (Petition, Ground One);

20

21    2.  The trial court assertedly violated the Constitution by

22  denying Petitioner's motion to dismiss the jury panel on the ground

23  that the prosecutor allegedly excluded an African-American juror in

24  violation of <u>Batson v. Kentucky</u>[3] ("<u>Batson</u>"); (Petition, Ground Two);

25  ///

26  ///

27  _____

28      [3]    476 U.S. 79 (1986).

1     3.   The allegedly erroneous use of CALJIC 2.15 assertedly

2 lessened the prosecution's burden of proof (Petition, Grounds Three

3 and Six);

4

5     4.   The prosecution allegedly engaged in vindictive prosecution

6 by charging Petitioner with four counts of receiving stolen property

7 after a detective assertedly promised Petitioner that the detective

8 would recommend that no additional charges be filed, and after

9 Petitioner declined a plea bargain (Petition, Ground Four);

10

11     5.   The trial court's denial of Petitioner's motion to substitute

12 counsel allegedly violated Petitioner's constitutional right to

13 counsel (Petition, Ground Five);

14

15     6.   The trial court allegedly imposed an upper term sentence in

16 violation of Apprendi and Blakely (Petition, Ground Seven; Traverse,

17 pp. 2, 5); and

18

19     7.   The prosecution's use of evidence supporting the charges of

20 receiving stolen property was allegedly "precluded per agreement" and

21 allegedly violated Petitioner's Fifth Amendment privilege against

22 self-incrimination (Petition, Ground Eight).

23

24                        **STANDARD OF REVIEW**

25

26     A federal court may not grant an application for writ of habeas

27 corpus on behalf of a person in state custody with respect to any

28 claim that was adjudicated on the merits in state court proceedings

1   unless the adjudication of the claim: (1) "resulted in a decision that

2   was contrary to, or involved an unreasonable application of, clearly

3   established Federal law, as determined by the Supreme Court of the

4   United States"; or (2) "resulted in a decision that was based on an

5   unreasonable determination of the facts in light of the evidence

6   presented in the State court proceeding."  28 U.S.C. § 2254(d) (as

7   amended); Woodford v. Visciotti, 537 U.S. 19, 24-26 (2002); Early v.

8   Packer, 537 U.S. 3, 8 (2002); Williams v. Taylor, 529 U.S. 362, 405-09

9   (2000).

10

11       "Clearly established Federal law" refers to the governing legal

12   principle or principles set forth by the Supreme Court at the time the

13   state court renders its decision.  Lockyer v. Andrade, 538 U.S. 63

14   (2003).  A state court's decision is "contrary to" clearly established

15   Federal law if: (1) it applies a rule that contradicts governing

16   Supreme Court law; or (2) it "confronts a set of facts . . .

17   materially indistinguishable" from a decision of the Supreme Court but

18   reaches a different result.  See Early v. Packer, 537 U.S. at 8

19   (citation omitted); Williams v. Taylor, 529 U.S. at 405-06.

20

21       Under the "unreasonable application prong" of section 2254(d)(1),

22   a federal court may grant habeas relief "based on the application of a

23   governing legal principle to a set of facts different from those of

24   the case in which the principle was announced."  Lockyer v. Andrade,

25   538 U.S. at 76 (citation omitted); see also Woodford v. Visciotti, 537

26   U.S. at 24-26 (state court decision "involves an unreasonable

27   application" of clearly established federal law if it identifies the

28   correct governing Supreme Court law but unreasonably applies the law

1  to the facts).  A state court's decision "involves an unreasonable
2  application of [Supreme Court] precedent if the state court either
3  unreasonably extends a legal principle from [Supreme Court] precedent
4  to a new context where it should not apply, or unreasonably refuses to
5  extend that principle to a new context where it should apply."
6  Williams v. Taylor, 529 U.S. at 407 (citation omitted).
7
8      "In order for a federal court to find a state court's application
9  of [Supreme Court] precedent 'unreasonable,' the state court's
10 decision must have been more than incorrect or erroneous."  Wiggins v.
11 Smith, 539 U.S. 510, 520-21 (2003) (citation omitted).  "The state
12 court's application must have been 'objectively unreasonable.'"  Id.
13 (citation omitted); see also Clark v. Murphy, 331 F.3d 1062, 1068 (9th
14 Cir.), cert. denied, 540 U.S. 968 (2003).
15
16     In applying these standards, this Court looks to the last
17 reasoned state court decision.  See Davis v. Grigas, 443 F.3d 1155,
18 1158 (9th Cir. 2006) (citation and quotations omitted).  To the extent
19 no such reasoned opinion exists, as where a state court rejected a
20 claim in an unreasoned order, this Court must conduct an independent
21 review to determine whether the decisions were contrary to, or
22 involved an unreasonable application of, "clearly established" Supreme
23 Court precedent.  See Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir.
24 2000).  If state court declined to decide a federal constitutional
25 claim on the merits, this Court must consider that claim under a de
26 novo standard of review rather than the more deferential "independent
27 review" of unexplained decisions on the merits authorized by Delgado
28 v. Lewis.  See Lewis v. Mayle, 391 F.3d 989, 996 (9th Cir. 2004)

1   (standard of _de novo_ review applicable to claim state court did not

2   reach on the merits).

3

4                                     **DISCUSSION**

5

6      For the reasons discussed below, the Petition should be denied

7   and dismissed with prejudice.

8

9   I.   **The Trial Court's Allocation of Peremptory Challenges Does Not**

10      **Entitle Petitioner to Habeas Relief.**

11

12     A.   **Background**

13

14   California Code of Civil Procedure section 231(a) provides:

15

16      In criminal cases, if the offense charged is punishable

17     with death, or with imprisonment in the state prison for

18     life, the defendant is entitled to 20 and the people to 20

19     peremptory challenges. Except as provided in subdivision

20     (b),[4] in a trial for any other offense, the defendant is

21     entitled to 10 and the state to 10 peremptory challenges.

22     When two or more defendants are jointly tried, their

23     challenges shall be exercised jointly, but each defendant

24     shall also be entitled to five additional challenges which

25     may be exercised separately, and the people shall also be

26   ————————————————

27       [4]   Subdivision (b) of California Code of Civil Procedure section 231 governs the number of peremptory challenges for

28   offense punishable by a maximum term of imprisonment of 90 days or less, and hence was inapplicable in Petitioner's trial.

1         entitled to additional challenges equal to the number of all

2         the additional separate challenges allowed the defendants.

3

4         The prosecution alleged that Gonzales had suffered four prior

5 convictions qualifying Gonzales for a life sentence under California's

6 "Three Strikes Law," California Penal Code sections 667(b) - (i) and

7 1170.12(a) - (d) (C.T. 146I-146J).[5] Petitioner, charged only with one

8 prior strike, did not face a life sentence (see R.T. 605; C.T. 146J).[6]

9 The trial court ruled that: (1) Gonzales was entitled to twenty

10 peremptory challenges; (2) Petitioner was entitled to ten peremptory

11 challenges; (3) the two defendants could exercise ten challenges

12 jointly; and (4) each defendant would have five additional separate

13 peremptory challenges (R.T. 605-06, 686-87).  During voir dire,

14 Petitioner and Gonzales used their ten joint challenges, and

15 Petitioner used his additional five challenges.  The trial court

16 denied Petitioner's subsequent request for additional joint and

17 separate peremptory challenges and motion for a mistrial (R.T. 901-

18 04).

19 ///

20 ///

21         Petitioner contends the trial court erred by refusing to allow

22

23       [5]   The Three Strikes Law consists of two nearly identical
statutory schemes.  The earlier provision, enacted by the

24 Legislature, was passed as an urgency measure, and is codified as
California Penal Code §§ 667(b) - (I) (eff. March 7, 1994).  The

25 later provision, an initiative statute, is embodied in California
Penal Code § 1170.12 (eff. Nov. 9, 1994).  See generally People

26 v. Superior Court (Romero), 13 Cal. 4th 497, 504-05, 53 Cal.
Rptr. 2d 789, 917 P.2d 628 (1996).  The prosecution charged

27 Gonzales under both versions (C.T. 146I-146J).

28       [6]   See Cal. Penal Code §§ 667(e)(1), 1170.12(c)(1).

1   Petitioner to participate in all twenty of Gonzales' peremptory

2   challenges and by denying Petitioner's request for additional

3   challenges.  Petitioner "acknowledges that it has been held that what

4   occurred in this case was not violative of a criminal defendant's

5   constitutional rights to due process, equal protection, and

6   fundamental fairness" (Petition, attached memorandum, p. 4).  However,

7   Petitioner argues that California Code of Civil Procedure section 231

8   creates a liberty interest protected by the Fourteenth Amendment

9   (attached memorandum, p. 4).  Petitioner contends that, had his trial

10  been severed from that of Gonzales, Petitioner would have been

11  entitled to ten peremptory challenges which he would not have had to

12  exercise jointly with a co-defendant, and the prosecutor would have

13  had only ten challenges, instead of the thirty the prosecutor was

14  accorded in the joint trial (Petition, attached memorandum, pp. 6-7).

15

16      The Court of Appeal ruled that the trial court had erred in

17  allotting more than fifteen challenges to Gonzales.  People v.

18  Gonzales, 2003 WL 22346373, at *3 (citing People v. Brown, 42 Cal.

19  App. 4th 461, 49 Cal. Rptr. 2d 652 (1996)).  The Court of Appeal

20  deemed Petitioner to have conceded that there was no violation of

21  Petitioner's constitutional rights to "due process, equal protection

22  or fundamental fairness."  People v. Gonzales, 2003 WL 22346373, at

23  *2.  However, the Court of Appeal also ruled that Petitioner had

24  failed to show that the allotment of peremptory challenges resulted in

25  prejudice or an unfair trial.  (id.).

26  ///

27  ///

28      The Court of Appeal did not address Petitioner's claim that

14

1  California Penal Code section 231 created a liberty interest

2  enforceable under the Due Process Clause of the Fourteenth Amendment.

3  Because the Court of Appeal did not reach the constitutional issue

4  raised here, this Court's review is <u>de novo</u>.  <u>See</u> <u>Lewis v. Mayle</u>, 391

5  F.3d at 996.[7]

6

7      The Ninth Circuit has held that, to the extent California Code of

8  Civil Procedure section 231 "creates a statutory right to twenty

9  peremptory challenges when a defendant faces a sentence of death or

10 life imprisonment," the right "is a state-created liberty interest

11 protected by the Fourteenth Amendment to the Constitution." <u>Vansickel</u>

12 <u>v. White</u>, 166 F.3d 953 (9th Cir.), <u>cert. denied</u>, 528 U.S. 965 (1999).

13 Thus, a trial court's failure to allow a defendant to exercise the

14 number of peremptory challenges authorized by state law can violate

15 Due Process.  <u>Id.</u>

16

17     However, neither Petitioner nor Gonzales was charged with any

18 crime carrying a life sentence.  <u>See</u> Cal. Penal Code §§ 460, 461

19 (residential burglary is first degree burglary punishable by two, four

20 or six year prison term); Cal. Penal Code § 18; Cal. Vehicle Code §

21 2800.2 (term of sixteen months, one year or two years for evading an

22 officer); Cal. Penal Code §§ 18, 496 (receiving stolen property

23 punishable by one year in county jail or state prison term of sixteen

24 months, two years or three years); Cal. Penal Code §§ 18, 12021(a)

25 (term of sixteen months, two years or three years for ex-felon in

26 _____

27      [7]   This Court does not deem Petitioner to have waived

28 his Due Process challenge to the trial court's allotment of
peremptory challenges.

1  possession of a firearm); Cal. Penal Code § 182(a) (conspiracy to

2  commit a felony punishable in same manner as that felony). Although

3  the Information alleged that Gonzales qualified for a life sentence

4  under California's "Three Strikes Law," under California law "the only

5  factor which determines whether the defendant receives additional

6  peremptory challenges is whether the defendant is charged with an

7  offense which alone carries the potential for a life sentence."

8  People v. Brown, 42 Cal. App. 4th at 477 (rejecting argument that

9  defendant was entitled to twenty peremptory challenges because he

10 faced a "de facto" life sentence if possible determinate sentences on

11 multiple charges were aggregated). Petitioner was not entitled to

12 share in a greater number of peremptory challenges than that to which

13 he and his co-defendant were entitled under the statute.

14

15      Contrary to Petitioner's apparent argument, California law did

16 not entitle Petitioner to the number of peremptory challenges to which

17 he would have been entitled had he been tried separately. "California

18 courts have held that defendants who are charged with multiple counts

19 of a like nature are not entitled to the same number of peremptory

20 challenges they would have received if they had had a separate trial

21 for each offense." People v. Brown, 42 Cal. App. 4th 461, 477, 49

22 Cal. Rptr. 2d 652 (1996). Because no state law error occurred with

23 respect to the number of peremptory challenges allotted to Petitioner,

24 that allotment did not infringe any liberty interest arising from the

25 application of California Penal Code section 231. Petitioner is not

26 entitled to habeas relief on Ground One of the Petition.

27

28 II.  **Petitioner's Batson Claim Does Not Merit Habeas Relief.**

## A.   **Background**

The prosecutor exercised a total of fifteen peremptory challenges.  Petitioner contends the prosecutor's thirteenth challenge, to Juror No. 4482, violated Batson.

The prosecutor accepted the jury shortly before a new panel was called which included Juror No. 4482 (R.T. 750).  Of those jurors on the panel accepted by the prosecutor at that time, seven ultimately served on Petitioner's jury.[8]

Juror No. 4482 was a single administrative assistant who had one child and who lived in Los Angeles (R.T. 754).  She had prior jury experience in which the jury had reached a verdict (R.T. 754).  After the judge asked the jury panel if any of the jurors had a close relative who had been charged with receiving stolen property, commercial or residential burglary or evading police, Juror No. 4482 requested a private conference (R.T. 917).

Out of the hearing of the other prospective jurors, Juror No. 4482 told the court that approximately twelve years ago her brother had been arrested on a charge of receiving a stolen car (R.T. 918). Juror No. 4482 was not present when her brother was arrested and did not go to court with him (R.T. 918).  The case eventually was dismissed (R.T. 918-19).  Juror No. 4482 recalled that a neighbor across the street who was her brother's friend stole the car, parked

___

[8]   One (Juror No. 8940) subsequently was excused for cause due to an illness in the family (R.T. 909).

17

1   it in "our backyard," and asked her brother to fix the car (R.T. 919).

2

3      When the court asked if Juror No. 4482 had an opinion whether or

4   not her brother was fairly treated, Juror No. 4482 said, non-

5   responsively: "He was fairly treated?" (R.T. 919).  Petitioner's

6   counsel asked whether anything about the situation would affect the

7   juror's ability to be a fair and impartial juror in the case, and

8   Juror No. 4482 replied "Yes."  (R.T. 919-20).  The following occurred:

9

10         [Petitioner's counsel]:  How would it affect you?

11

12         Prospective Juror No. 4482:  It's a different part with

13       the residential burglary.

14

15         [Petitioner's counsel]:  Yes.

16

17         Prospective Juror No. 4482:  Actually our neighbor, my

18       babysitter's son, was just convicted of that same crime.

19

20         [Petitioner's counsel]:  So that is unrelated to your

21       brother's case?

22

23         Prospective Juror No. 4482:  Correct.

24

25         [Petitioner's counsel]:  Would that incident have an

26       affect [sic] on your ability to decide this case?

27

28         Prospective Juror No. 4482:  Yes.

1    [Petitioner's counsel]:  Why is that?

2

3    Prospective Juror No. 4482:  I guess the nature of the

4    burglary.

5

6    [Petitioner's counsel]:  The nature of the charges in

7    this case, two counts of burglary.

8

9    Prospective Juror No. 4482:  Right.

10

11   [Petitioner's counsel]:  That would impact you to such

12   a degree as you related to what happened with your

13   babysitter's son?

14

15   Prospective Juror No. 4482:  Correct.

16

17   [Petitioner's counsel]:  That you couldn't sit and

18   decide this case?

19

20   Prospective Juror No. 4482:  I don't think fairly, no.

21

22   [Petitioner's counsel]:  You would be unfair against

23   the defense in favor of the prosecution or against the

24   prosecution and in favor of the defense?

25  ///

26  ///

27   Prospective Juror No. 4482:  Probably in favor of the

28   prosecution.

19

1       [Petitioner's counsel]:  Do you think you couldn't sit

2    and listen to the evidence and make an independent decision?

3

4       Prospective Juror No. 4482:  I am sure I would be able

5    to.  I think so.

6

7       [Petitioner's counsel]:  Could you put away this

8    feeling you have in favor of the defense [sic] if it turned

9    out the evidence were in favor of the defense?

10

11       Prospective Juror No. 4482:  I can try to.

12

13  (R.T. 920-21).

14

15    The prosecutor then engaged in the following colloquy with Juror

16  No. 4482:

17

18       [Prosecutor]:  Do you remember what agency was it that

19    arrested your brother?  If you can recall, was it around

20    here?

21

22       Prospective Juror No. 4482:  No.  It was in

23    Los Angeles.

24  ///

25  ///

26       [Prosecutor]:  I guess following up on [Petitioner's

27    counsel's] questions, your babysitter's son was arrested?

28

1    Prospective Juror No. 4482:  Yes.

2

3    [Prosecutor]:  He was convicted of burglary?

4

5    Prospective Juror No. 4482:  Yes.

6

7    [Prosecutor]:  You think that has impacted you in some

8    way?

9

10   Prospective Juror No. 4482:  Yes.

11

12   [Prosecutor]:  You would be more favorable toward the

13   prosecution, more biased towards the defense?

14

15   Prospective Juror No. 4482:  Yes.

16

17   (R.T. 921-22).

18

19   The court then addressed Juror No. 4482 as follows:

20

21   The Court:  The court is going to basically tell you,

22   I should have done it before with the new group, we haven't

23   had time yet, but basically as a juror you have two duties

24   to perform.  One is to be the judges of the facts if you are

25   selected and then when the court instructs you on the law

26   that applies to this case, [to] determine whether or not the

27   law given to you by the court is applicable to those facts

28   or applied to those facts.  Can you do that?

21

1   Prospective Juror No. 4482:  Yes.

2

3   The Court:  And are you a common sense person?

4

5   Prospective Juror No. 4482:  Yes.

6

7   The Court:  Can you use common sense?

8

9   Prospective Juror No. 4482:  Yes.

10

11   The Court:  Are you a reasonable person?

12

13   Prospective Juror No. 4482:  Yes.

14

15   The Court:  Are you very close -- were you very close

16 to this neighbor, this son of the babysitter?

17

18   Prospective Juror No. 4482:  We grew up together.

19

20   The Court:  The question that I have as you sit there

21 as a juror because we sort of have to know, it's a little

22 difficult sometimes, we have to know ahead of time whether

23 or not you can be fair to both sides or in this case three

24 sides, two defendants, and you must be equally fair to the

25 prosecution, to Mr. Gonzales . . . and to Mr. Palenzuela . .

26 . .

27

28   Do you think at this time you can be fair equally to

1   all three sides?

2

3        Prospective Juror No. 4482:  I can try to do that.

4

5        The Court:  If you don't mind telling me what it is

6   about the neighbor or the young man that you grew up with

7   that would not allow you to be fair to the defense?  What

8   about that case?

9

10       Prospective Juror No. 4482:  The only thing I can say

11  is I think it's the nature of that case.  There was actually

12  assault along with that case and maybe that is taking me to

13  one side, but that is why I said I could probably listen to

14  the evidence and become a fair person because I'm sure that

15  this case is not -- does not involve assault.

16

17       The Court:  Now, I didn't read any of those charges.  I

18  didn't read any assault, any battery or anything like that.

19  You have been a juror once before, correct?

20

21       Prospective Juror No. 4482:  Yes.

22

23       The Court:  There was a verdict?

24  ///

25       Prospective Juror No. 4482:  Yes.

26

27       The Court:  Civil or criminal case?

28

1        Prospective Juror No. 4482:  Actually I'm not sure.

2    It was a case of domestic violence.

3

4        The Court:  Criminal case.  Now, in a criminal case,

5    the defendants here, Mr. Gonzales and Mr. Palenzuela, are

6    presumed to be innocent until the contrary is proven.  Just

7    because I read a complaint, because I read ten charges, that

8    by itself doesn't mean anything.  The paper will hold

9    anything you put on it.  Do you understand that?

10

11        Prospective Juror No. 4482:  Yes.

12

13        The Court:  Just like anything else.  Just because

14   perhaps I may have received three or four tickets in the

15   past, or [Petitioner's counsel] or [the prosecutor] or you

16   yourself, doesn't mean because you get a traffic ticket

17   today when you leave the courthouse simply because you

18   received one in the past you would be guilty from the

19   beginning of the new ticket, correct?

20

21        Prospective Juror No. 4482:  Correct.

22

23        The Court:  And of course Mr. Gonzales and

24   Mr. Palenzuela here, there is no relationship whatsoever

25   with your neighbor.

26

27        Prospective Juror No. 4482:  Correct.

28

1        The Court:  After we talk to you about all this do you

2    think you can be fair to both sides?

3

4        Prospective Juror No. 4482:  Yes.

5

6        The Court:  Can you follow the law?

7

8        Prospective Juror No. 4482:  Yes.

9

10   (R.T. 922-24).

11

12       The prosecutor used his next peremptory challenge to strike Juror

13   No. 4482 (R.T. 957).  Palenzuela's counsel immediately said: "Your

14   honor, may we be heard?" (R.T. 957).  At sidebar, the following

15   occurred:

16

17       [Petitioner's counsel]:  Judge, I am suggesting --

18   well, first off I should state she was an African American.

19

20       The Court:  Yes.

21

22       [Petitioner's counsel]:  And under 231.5 of the Code of

23   Civil Procedure, the California Wheeler case and Batson

24   versus Kentucky, I would suggest that she has been excused

25   because of her race.  She indicated she would be biased

26   against the defendants if anything, not against the People.

27   She said her brother had been arrested twelve years ago but

28   the case against him was dismissed and he had been treated

25

1 fairly.  She said that because of the other experience she

2 would be biased against the defense if anything, so I can't

3 see what possible legitimate reason there is for excusing

4 her.

5

6   The Court:  Thank you.

7

8   [Gonzales' counsel]:  Yes.  I too am concerned about

9 that.  I think we have a panel that is almost completely

10 absent in terms of African Americans and Hispanics.  Both

11 our clients are Hispanic and the only Hispanic that was part

12 of the panel that was seated in the jury box was one we

13 excused by stipulation because of personal problems that

14 kept -- that we recognize that he would be permitted to take

15 care of.

16

17   The Court:  Well, all the Hispanics on the panel, they

18 have been excused.

19

20   [Gonzales' counsel]:  I think that -- we have got to

21 try to reach a jury of my client's peers and we are not

22 doing that based on the panel we have in this case.

23

24   The Court:  Thank you.

25

26   [Petitioner's counsel]:  I just want to state for the

27 record the 11 up there now appear to be all Caucasians of

28 one stripe or another and two Asians.

1          The Court:  One, two Asians, three Asians or two

2     Asians, two Hispanics.  Three Asians, one Hispanic, or two

3     Asians, two Hispanics.

4

5          [Petitioner's counsel]:  I don't see any Hispanics.

6

7          The Court:  I do.  Thank you.

8

9          [Petitioner's counsel]:  I think we need to --

10

11         The Court:  With all due respect, I think that a

12    person's last name, I don't really know what establishes a

13    person's ethnicity because there are many people that could

14    have a Spanish last name and they could be Anglo Saxon as

15    white milk from a goat.  They could be Oriental looking and

16    they could have the last name of Jones, so I am not going to

17    sit here and now read every last name of the juror because

18    that in itself does not indicate anything.

19

20         [Petitioner's counsel]:  I would ask then for purposes

21    of the record because we are being so winded [sic] on the

22    identification, for the court to say which jurors he

23    believes are Hispanic.

24  ///

25         The Court:  I think right now Juror Number Nine is

26    Hispanic, Oriental or Filipino.

27

28         I think Juror Number 16 is Hispanic.

27

1          [Petitioner's counsel]:   She isn't one of the twelve.

2

3          The Court:   Okay.   Thank you.   Your motion is denied.

4          . . .

5

6    (R.T. 958-60).

7

8          The trial court thus denied Petitioner's Batson motion without

9    requesting the prosecutor to provide an explanation for the strike of

10   Juror No. 4482.   The Court of Appeal ruled that Petitioner had not met

11   his burden, at the first step of the analysis, to show a prima facie

12   Batson violation.   See People v. Gonzales, 2003 WL 22346373, at *4-5

13   (Cal. Ct. App. Oct. 15, 2003).

14

15   B.   **Discussion**

16

17        Analysis of a Batson claim requires three steps.   Johnson v.

18   California, 545 U.S. 162, 168 (2005); Miller-El v. Cockrell, 537 U.S.

19   322, 328-29 (2003).   First, a defendant must establish a prima facie

20   case of purposeful discrimination.   Miller-El v. Cockrell, 537 U.S. at

21   328; Batson, 476 U.S. at 93-95.   To establish a prima facie case, the

22   defendant must show that the prosecutor struck jurors of a particular

23   race, gender, or ethnicity, and that, considering the totality of the

24   circumstances, "these facts and other relevant circumstances raise an

25   inference that the prosecutor used that practice to exclude the

26   veniremen from the petit jury on account of [the forbidden

27   characteristic]."   Batson, 476 U.S. at 94-97; see also Johnson v.

28   California, 545 U.S. at 168.

1   Once a _prima facie_ case has been shown, the burden shifts to the

2   prosecution to "come forward with a race-neutral explanation" for the

3   strike. <u>Johnson v. California</u>, 545 U.S. at 168; <u>Miller-El v.</u>

4   <u>Cockrell</u>, 537 U.S. at 328; <u>Batson</u>, 476 U.S. at 97. If the prosecution

5   meets this burden, the defendant then bears the burden to prove that

6   the prosecutor's proffered reason was pretextual, and that the real

7   reason for the strike was discriminatory. <u>Johnson v. California</u>, 545

8   U.S. at 168; <u>Miller-El v. Cockrell</u>, 537 U.S. at 328-29; <u>Purkett v.</u>

9   <u>Elem</u>, 514 U.S. 765, 767-68 (1995). "[T]he ultimate burden of

10  persuasion regarding racial motivation rests with, and never shifts

11  from, the opponent of the strike." <u>Purkett v. Elem</u>, 514 U.S. at 768

12  (citation omitted).

13

14  In <u>People v. Wheeler</u>, 22 Cal. 3d 258, 280, 148 Cal. Rptr. 890,

15  583 P.2d 748 (1978), the California Supreme Court held that, to show a

16  _prima facie_ case, the party challenging the strike must show a "strong

17  likelihood" that the party exercising the strike did so on account of

18  the juror's race. In <u>Wade v. Terhune</u>, 202 F.3d 1190, 1197 (9th Cir.

19  2000), the Ninth Circuit ruled that the "strong likelihood" test was

20  "impermissibly stringent" and did not comport with <u>Batson</u>'s

21  "reasonable inference" standard. However, in several subsequent cases

22  the California Supreme Court held that <u>Wheeler</u>'s "strong likelihood"

23  standard was essentially the same as the <u>Batson</u> standard. <u>See People</u>

24  <u>v. Johnson</u>, 30 Cal. 4th 1302, 1312-14, 1 Cal. Rptr. 3d 1, 71 P.3d 270

25  (2003), <u>cert. dismissed</u>, 541 U.S. 428 (2004), <u>opinion on remand</u>,

26  <u>People v. Johnson</u>, 2004 WL 1770615 (Cal. Ct. App. Aug. 5, 2004),

27  <u>rev'd</u>, 545 U.S. 162 (2005); <u>People v. Box</u>, 23 Cal. 4th 1153, 1188

28  n. 7, 99 Cal. Rptr. 2d 69, 5 P.3d 130 (2000), <u>cert. denied</u>, 532 U.S.

1   963 (2001). In <u>Johnson v. California</u>, 545 U.S. at 168, the United

2   States Supreme Court disapproved the <u>Wheeler</u> "strong likelihood"

3   standard as inconsistent with <u>Batson</u>.

4

5         It is unclear what standard the state courts employed in this

6   case. The trial court did not enunciate any standard.[9] The Court of

7   Appeal simply described the three-step <u>Batson</u> analysis, citing <u>Purkett</u>

8   <u>v. Elem</u>, 514 U.S. at 767, and <u>People v. Silva</u>, 25 Cal. 4th 345, 384,

9   106 Cal. Rptr. 2d 93, 21 P.3d 769 (2001).[10] However, at the time of

10  the Court of Appeal's decision on October 15, 2003, the California

11  Supreme Court had issued its decision in <u>People v. Johnson</u>, <u>supra</u>,

12  equating the "strong likelihood" and "reasonable inference" standards.

13  As of the date of the Court of Appeal's decision in Petitioner's case,

14  the United States Supreme Court had not yet granted the first petition

15  for certiorari in <u>People v. Johnson</u>.[11] It thus appears that the state

16

17       [9]   Earlier in the voir dire proceedings, the court
    indicated that Petitioner's attorney had used three of his last
18  seven peremptory challenges to strike "people of Oriental
    descent" from the jury, and held a <u>prima facie</u> showing of
19  discrimination existed (R.T. 743). The court did not indicate
    the standard it employed to make this determination.
20

21       [10]  <u>People v. Silva</u> does not discuss the standard used in
    determining the existence of a <u>prima facie</u> case.
22

23       [11]  The California Supreme Court decided <u>People v. Johnson</u>
    on June 30, 2003. The United States Supreme Court granted the
24  petition for writ of certiorari on December 1, 2003. The Supreme
    Court subsequently dismissed the petition on jurisdictional
25  grounds, holding the California Supreme Court's decision was not
    yet final. <u>See Johnson v. California</u>, 541 U.S. 428 (2004). On
26  remand, the Court of Appeal applied the California Supreme
    Court's holding in <u>People v. Johnson</u>, <u>supra</u>. <u>See People v.</u>
27  <u>Johnson</u>, 2004 WL 1770615, at *1. The United States Supreme Court
    granted certiorari to review the Court of Appeal's decision on
28                                              (continued...)

1    courts probably applied the Wheeler "strong likelihood" standard in

2    Petitioner's case.  Because the state courts appear to have applied an

3    incorrect standard, this Court's review is de novo.  See Paulino v.

4    Castro, 371 F.3d 1083, 1090 (9th Cir. 2004); Cooperwood v. Cambra,

5    245 F.3d 1042, 1046 (9th Cir.), cert. denied, 534 U.S. 900 (2001).

6

7         To show a prima facie Batson violation, Petitioner must show

8    that: (1) the prospective juror was a member of a cognizable racial

9    group; (2) the prosecutor used a peremptory strike to remove the

10   juror; and (3) the totality of the circumstances raises an inference

11   that the strike was motivated by race.  Boyd v. Newland, 467 F.3d

12   1139, 1143 (9th Cir. 2006) (as amended), cert. denied, 127 S. Ct. 2249

13   (2007).  Here, it is not disputed that Juror No. 4482 was African-

14   American and that the prosecutor used a peremptory strike to remove

15   her.  The issue is whether the "totality of the circumstances" raises

16   an inference that the strike was discriminatory.

17

18        In determining this issue, the Court may engage in a statistical

19   analysis comparing the number of minority prospective jurors stricken

20   to the number of non-minority prospective jurors stricken.  See id. at

21   1147.  The Court also should conduct a comparative analysis including

22   a comparison of the excluded juror with the other jurors whom the

23   prosecutor did not strike.  Id. at 1148-49.  The Court may consider

24   the issue in light of the facts at the time of the Batson motion and

25   also in light of subsequent voir dire proceedings.  Id. at 1151; Wade

26   _____

27        [11](...continued)
     January 7, 2005.  See Johnson v. California, 543 U.S. 1042
28   (2005).